## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**GEOFFREY H. ANDERSON,**

    **Plaintiff,**

**vs.**                             **Case No. 4:09cv134-RH/WCS**

**ANDREW DAWSON,**
**et al.,**

    **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Pending are two motions for summary judgment filed on May 24, 2011.  The first motion was filed by Defendants Bennett and Campbell, doc. 94, and relevant to that motion is a notice of filing a redacted exhibit.  Doc. 96.  The second motion was filed by Defendants Dawson and Ruth, doc. 95, which is also supported by a separate notice of filing an additional affidavit, doc. 97.  The *pro se* Plaintiff was advised of his obligation to respond, doc. 98, and he has now filed responses to those motions, docs. 103, 104.

**Procedural Issues**

Plaintiff filed his fourth amended complaint, doc. 18, on January 27, 2010.  The complaint was against seven Defendants.  Doc. 18, pp. 1, 5-6.  Service was directed on the Defendants: Deputy Andrew Dawson, Sergeant Tim Ruth, Jail Administrator Carl

Bennett, Sheriff Larry Campbell, Nurse Edith Brandt, Nurse Jennifer Frost, and

Physician's Assistant J. McFarland.  Doc. 30.

Service was returned unexecuted as to Defendants Brandt and McFarland.  Doc.

35.  Plaintiff was directed to clarify whether he had incorrect names for those two

Defendants, whether he wished to voluntarily dismiss his claims against them, or

whether he would seek to determine their whereabouts to continue this case against

those Defendants.  Doc. 37.  Plaintiff responded that he would not voluntarily dismiss

his claims, but would use discovery to locate the unserved Defendants.  Doc. 44.

Plaintiff has never come forward with service information on these two Defendants and,

therefore, Plaintiff's claims against Defendants Edith Brandt and J. McFarland should be

dismissed for insufficient service of process and failure to prosecute.

Plaintiff has previously voluntarily dismissed his claim against Defendant Jennifer

Frost.  Docs. 88, 91, 93, and 99.

**Allegations of the Fourth Amended Complaint, doc. 18**

In general, Plaintiff complains about treatment at the Leon County Jail after his

arrest on December 30, 2005.[1]  Plaintiff alleges generally that Defendants were

deliberately indifferent to his severe injuries and did not provide him with medical care.

*Id.*, at 7-8.  Plaintiff contends Defendants Ruth and Dawson verbally threatened him,

taunted him with his soiled underwear, ignored his requests for help, and that along with

Tallahassee Police Officer Holly Lofland, they "conspired together" and "manufactured"

---

[1] Plaintiff separately litigated claims concerning that arrest in case 4:09cv142-RH/WCS.  Judgment was entered in favor of the Defendants on August 10, 2011, finding Plaintiff's claims of excessive force were false as revealed on a videotape of that arrest.  Doc. 117.

false documents concerning his arrest and the breathalyzer test.  *Id.*, at 8.   Plaintiff

claims Defendants Ruth and Dawson directed the nurse not to document Plaintiff's

injuries and that they cleaned "gashes and bloodsmears" from Plaintiff's face before

taking booking photographs to conceal his injuries.  *Id.*, at 9.

   Plaintiff alleges that he was forced to lie on the floor for hours in pain.  Plaintiff

claims he spent six days in pain, and was unable to eat for three days.  *Id.*, at 10.  He

alleges that his back pain was so severe, he "was forced to crawl across the concrete

floor to the little trap door in the cell door, so that his blood pressure could be measured

and stool samples provided to the nurse."  *Id.*  Plaintiff alleges having blood in his urine

and stool "from internal bleeding, which caused severe abdominal pain."  *Id.*, at 10.  He

also claims he was "denied pain medication; denied sheets or a pillow; denied a

toothbrush and toothpaste; denied soap or the means to bathe; and denied writing

implements, paper, or a telephone call."  *Id.*  Plaintiff said he was not allowed to leave

his cell or communicate to anyone."  *Id.*  Plaintiff also alleges that jail policies permit

deliberate indifference to medical needs,[2] concealment of arrest injuries, and threats of

physical violence by jail staff.  *Id.*, at 13.

   In addition to his civil rights claims, Plaintiff brings state law claims for assault,

causing him extreme mental anguish, humiliation, and the intentional falsification of

official documents to conceal Plaintiff's injuries and to obstruct justice and deny Plaintiff

equal protection.  *Id.*, at 16.

---

   [2] Much of Plaintiff's complaint alleges medical issues which are omitted from this
report and recommendation as the Defendants pertaining to medical care (Frost,
Brandt, and McFarland) are no longer parties to this case.

**Dawson and Ruth's summary judgment motion, doc. 95**

Defendants contend they took no actions that violated Plaintiff's rights and are entitled to qualified immunity. They further assert that Plaintiff cannot maintain an official capacity claim against them as a matter of law, and that Plaintiff "failed to prove any set of facts that establish a claim for conspiracy under 42 U.S.C. §§ 1985, 1986.

**Bennett and Campbell's summary judgment motion, doc. 94**

Defendants assert they did not violated Plaintiff's rights, are entitled to qualified immunity, and contend Plaintiff cannot maintain an official capacity claim against Defendant Bennet as a matter of law. Defendants maintain that medical care provide to new arrestees and detainees is "not so inadequate as to amount to a policy of deliberate indifference to new arrestees and inmates housed in the Leon County Jail." Defendant Campbell asserts that Plaintiff's complaint fails to state a federal cause of action against him because the acts complained of were not caused by an official policy.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id.* An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S.

574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts.  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Industrial Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

**The relevant Rule 56(e) evidence**

**Defendants' evidence**

Plaintiff was arrested by the Tallahassee Police Department on December 30,
2005. Doc. 94, Ex. B (doc. 94-2). He was taken to the Leon County Jail and placed in
a holding cell where he was directed to change clothes. Doc. 94, Ex. A (doc. 94-1, p.
3).[3] After a period of time, Defendant Dawson escorted Plaintiff into another room to
administer a breathalyzer test. *Id.*, p. 4. After Plaintiff's fourth attempt, Plaintiff was
returned to his holding cell. *Id.*, p. 5. Defendant Dawson completed a Department of
Highway Safety & Motor Vehicles form and "Affidavit of Refusal to Submit to Breath,
Urine, or Blood Test," which was also attested to by arresting officer Holly Lofland. Doc.
94, Ex. B (doc. 94-2). The form indicates Plaintiff was advised of the consequences of
refusal and he refused to submit to the test. *Id.* A copy of the Implied Consent Warning
form was submitted by Plaintiff and indicates Plaintiff refused to sign the form. Ex. C
(doc. 103-1, p. 15).

Two deputies took Plaintiff to the nurse for examination. Doc. 94, Ex. A (doc. 94-
1, p. 6). Plaintiff was examined by nurse Edith Brandt, who is employed by Prison
Health Services. *Id.* Plaintiff was required to sign a document authorizing medical
attention. *Id.*, p. 7.

Defendants provided a copy of the Screening form that was completed by Nurse
Brandt. Doc. 94, Ex. H (doc. 94-8) (under seal).[4] The date and time are written on the

---

[3] Herein I will use the page numbers assigned by the electronic docket to the
exhibits and documents which have been filed, rather than to the page numbers which
appear on the paper copies.

[4] A redacted copy was filed on the public docket on May 25, 2011, with no
changes other than redacting Plaintiff's date of birth and social security number. Doc.
96-1.

form as 0100 hours on December 31, 2005.  *Id.*  The form provides basic information including Plaintiff's medical history, and provides blood pressure, pulse, and the like.  *Id.* Under the visual observation category, "No" is circled in response to whether the inmate exhibited visible signs of illness, injury, bleeding, head injury, symptoms requiring immediate medical attention, or unconsciousness.  *Id.*  "No" is also circled in response to whether the inmate had fever, skin lesions, infection, cuts, bruising, needle marks, or body vermin.  *Id.*  "Yes" is circled only for minor injuries, with the explanatory comment, "minor scrapes & abrasions over body."  *Id.*  The form indicates Plaintiff's mobility was not restricted in anyway, but he did appear to be under the influence of drugs or alcohol. *Id.*  Plaintiff's mood was "scared, stressed out."  *Id.*  The form notes under dental history that Plaintiff had bad teeth, broken caps and his last dental appointment had been one month earlier, but the date of his "last cleaning" was unknown.  *Id.*  There is no indication of any recently broken teeth.  *Id.*  At the end of the form, Plaintiff was cleared for placement in General Population.  *Id.*

Defendant Dawson submitted an affidavit in which he states that in 2005, he was a deputy sheriff and "worked as a road patrol deputy."  Doc. 95, Ex. E (doc. 95-5). Defendant Dawson states he did not have final policymaking authority with respect to the operation of the jail and did not have authority over "decisions with respect to medical care or medication provided to new arrestees or inmates housed in the Leon County Jail."  *Id.*  The jail contracts with Prison Health Services, Inc., to provide medical care to inmates housed in the jail.  *Id.*  Persons employed by Health Services have "sole authority with respect to decisions" concerning medical care, treatment, and medications provided to inmates or detainees at the jail.  *Id.*  Defendant Dawson avers

that he "had no authority or involvement in decisions relating to medical care, treatment or medications provided to new arrestees or inmates housed in the Leon County Jail." *Id.* Defendant Dawson stated in his affidavit that "on occasion" he was required "to report to the jail to administer a breathalyzer test to a new arrestee." *Id.* Defendant Dawson did not, however, "participate in any way in booking procedures or procedures for admitting new arrestees into the jail." *Id.*

Defendant Dawson said that on December 31, 2005, he "responded to a call for assistance from Tallahassee Police Officer Holly Lofland." *Id.* When he arrived on scene, "Plaintiff, who appeared to be intoxicated, was seated in Officer Lofland's patrol car." *Id.* Plaintiff was transported to the jail and met there by Defendant Dawson to administer a breathalyzer test. *Id.* "In accordance with the procedure for administering a breathalyzer test, the Plaintiff was placed in a holding cell for approximately twenty minutes for observation." *Id.* Plaintiff was then taken to a small room where Defendant Dawson "instructed him to blow into the tube attached to the breathalyzer machine." *Id.* Defendant Dawson explained what transpired:

> Rather than blowing into the breathalyzer machine as instructed, the Plaintiff inhaled, or sucked in on the tube. As a result, the breathalyzer machine did not register any reading. I again instructed the Plaintiff to blow into the tube and again the Plaintiff inhaled. I then stopped the machine to indicate Plaintiff's failed attempts as a refusal to take the test. I did not at any time threaten the Plaintiff with physical violence. I do not have any personal recollection of Plaintiff requesting medical attention during the breathalyzer test.

Doc. 95, ex. E (doc. 95-5).

Defendant Timothy Ruth also submitted his own affidavit in support of the summary judgment motion.  Doc. 95, Ex. F (doc. 95-6); doc. 97.[5]  He is certified as a correctional officer by the State of Florida, and has worked at the Leon County Jail since September 2, 1993.  Doc. 97.  Defendant Ruth holds the rank of Sergeant, which he held in 2005 at the time of the events at issue.  *Id.*  His duties "include ensuring that all posts are manned, booking and receiving people, addressing inmate complaints and assisting in the operation of the" Jail.  *Id.*  He does not create or establish policies or procedures, but must be aware of such and perform his "duties in accordance with those polices and procedures."  *Id.*  Defendant Dawson states that his authority as booking Sergeant does not include authority over decisions concerning medical care provided to inmates.  *Id.*  He has no authority or expertise to determine whether the medical care decisions made by employees of Prison Health Services, Inc., were appropriate, nor did he have authority to interfere with those decisions.  *Id.*  Defendant Ruth has "no personal recollection of Plaintiff" at the jail, nor does he "recall any of the events complained of by the Plaintiff."  *Id.*

Defendant Ruth explains that pursuant to Leon County Jail Standard Operating Procedure 9.01, when new arrestees are booked into the Jail, "they are fingerprinted, photographed and seen by a nurse employed by Prison [H]ealth Services, Inc. for a medical screening . . . ."  *Id.*  Defendant Dawson has "no reason to believe that this

---

[5] The original affidavit for Defendant Ruth as filed with the summary judgment motion did not contain the Defendant's signature.  A signed copy of Defendant Ruth's affidavit was filed on May 25, 2011, doc. 97, and is nearly identical, but contains several date changes relevant only to Defendant Ruth's employment background.

procedure was not followed on December 31, 2005 with regard to" Plaintiff Anderson.
*Id.*

A copy of Procedure 9.01 was provided as Defendants' Ex. D, doc. 94. (Doc. 94-4).  Pursuant to that policy, after processing into the jail and the inmate's personal property is inventoried and secured in the property room, an inmate is to be issued a toothbrush, toothpaste, shaving equipment, one comb, bar of soup, clean towel, a washcloth, a uniform, underwear, shower slides, and "clean bedding (linens)."  Doc. 94-4, pp. 14-15.

Defendant Campbell submitted an affidavit which states that in his "capacity as Sheriff of Leon County, Florida" he has "ultimate supervisory authority" of the jail and correctional officers who work at the jail.  Doc. 94, Ex. C (doc. 94-3).  Defendant Campbell is not "normally involved in the day-to-day operation of the" jail, but is "kept apprised of significant issues or events that arise in the jail by the jail administrator."  *Id.*  During the relevant time period, Defendant Carl Bennett was the jail administrator.  *Id.*  Defendant Campbell has no personal knowledge of the issues raised by Plaintiff nor any recollection "of ever discussing [Plaintiff] with Major Carol Bennett or any other individual."  *Id.*

Defendant Campbell explained that the "Sheriff's Office contracts with Prison Health Services, Inc. to provide medical care, including medication, to new arrestees and inmates housed in the Leon County Jail."  *Id.*  Employees of the Sheriff's Office "do not have authority or involvement in decisions with respect to medical care or medications provided to new arrestees and inmates housed in the" jail.  *Id.*  Those "decisions are made solely by employees of Prison Health Services, Inc."  *Id.*

Defendant Campbell states that he has "had no basis to know or believe that any new arrestee was denied requested medical treatment during the booking process" or that "any policy of the Leon County Sheriff's Office created or resulted in widespread abuse in which new arrestees or inmates housed in the Leon County Jail were denied proper medication or medical care."  *Id.*  Defendant Campbell also asserts that he has no personal knowledge or reason to believe that conditions exists, or a policy has created or resulted in widespread abuse of arrestees, concealment of injuries, threats of physical violence, or the denial of basic hygiene needs.  *Id.*

Defendant Bennett submitted an affidavit in which he states he was the jail administrator during the relevant period of time and as such, has delegated authority from the Sheriff "to oversee the day-to-day operation of the Leon County Jail."  Doc. 94, Ex. E (doc. 94-5).  He has no policymaking authority as that rests solely with Defendant Campbell.  Discretionary decisions are "subject to review by Sheriff Campbell."  *Id.* Defendant Bennett reiterates that employees of Prison Health Serves, Inc. "had sole authority with respect to decisions with respect to medical care, treatment and medications provided to inmates housed in the Leon County Jail."  *Id.*  Pursuant to Procedure 9.01, "all new arrestees were seen by a nurse employed by Prison Health Services, Inc. for a medical screening as part of the booking process."  *Id.*  "Moreover, a seriously ill or injured inmate would not be admitted to the jail until they were medically cleared."  *Id.*

Bennett states that correctional officers do "not have the authority to make any decision with respect to any medical care a new arrestee or inmate might require or request."  *Id.*  Defendant Bennett had "no authority or expertise to determine whether

decisions made" by the medical professionals as to Plaintiff's "care and medications were appropriate for his condition, nor did [he] have any authority to . . . interfere with decisions made by" those medical professionals employed by Prison Health Services. *Id.* Defendant Bennett has "no personal knowledge of or reason to believe that [Plaintiff] was denied his requests for medical attention by any employees of the Leon County Sheriff's Office." *Id.*

Defendants Campbell and Bennett provided a document entitled "Arrestee Injury Photo Information." Doc. 94, Ex. F (doc. 94-6); Doc. 95, Ex. H (doc. 95-8). This document provides the date of arrest as December 30, 2005, at 2327 hours, and lists Officer Holly Lofland as the arresting officer. *Id.* In response to the question "Injury type and location" the comment is written: "Scratches and abrasions on face and right arm by the elbow." *Id.* The form has checkmarks indicating that the following applied: Injury occurred during arrest; arrestee examined by EMS; arrestee examined by Jail Medical Unit, and arrestee cleared for incarceration by: Nurse Edith Brandt. *Id.* In the comments section is a notation that "Subject was involved in a physical altercation with the arresting officer during arrest. Subject was seen on scene by EMS and was cleared for jail custody by Nurse Edith Brandt at the facility." The officer listed as the reporting officer, photographer, and booking supervisor is Defendant Ruth. *Id.*

Defendants also provided a copy of a form entitled, "Inmate Issue/Service Statement," which has a checkmark on the comment "phone call deferred due to inmate being unmanageable." Doc. 94, Ex. G (doc. 94-7). In the place for the signature of the inmate is written, "Refused." *Id.* At the top of the form is a statement indicating the inmate received clothing and hygiene items, including "clean blanket, clean sheets,

clean towel, clean washcloth, clean pillowcase, clean underwear, toothbrush, toothpaste, soap, comb."  *Id.*

### Plaintiff's relevant evidence [6]

Plaintiff has submitted his sworn affidavit in which he avers that after "being transported to the jail, [he] was first held against a wall, and then dropped on the floor of a strip-search room, and later [he] was thrown to the floor of a booking room isolation cell."  Doc. 103, Ex. A, pp. 1-2 (doc. 103-1, pp. 2-3).  Plaintiff says that he was in the booking department for eight hours and "repeatedly begged for a doctor, or a nurse, or someone to give [him] medical attention for [his] injuries."  *Id.*, p. 3.  Plaintiff avers that Defendants Dawson and Ruth, and "every other jail staff person ignored" Plaintiff's pleas for medical treatment.  *Id.*  Plaintiff says that while he was changing clothes, Defendants Ruth and Dawson verbally threatened him saying, "We should kick your ass for hitting that cop."  *Id.*

Plaintiff states that "As a result of kicks to my abdomen by Tallahassee Police officers, I had excreted into my underwear."  *Id.*  He avers that Defendant Dawson put Plaintiff's soiled underwear into Plaintiff's "right hand and ordered [him] to put on the underwear."  *Id.*  Plaintiff reports he was humiliated as the other officers present laughed.  *Id.*  Plaintiff says that while he was in the isolation cell, he overheard Defendants Dawson, Ruth, and Officer Lofland talking.  *Id.*  Lofland said, "We need to

---

[6] Plaintiff filed two separate responses, docs. 103 and 104, but the same exhibits are filed with both responses.  For simplification, the exhibits will be referenced as exhibits to doc. 103.  Plaintiff's statement of facts are presented in his response to Campbell and Bennett's summary judgment motion, doc. 104, and adopted in the other response, doc. 103.  Only the evidence relevant to the claims presented in this case are considered.  Evidence presented which concern probable cause and the manner of Plaintiff's arrest are not relevant.

see that videotape.  We need to do something about this.  I beat him up badly." *Id.*

Defendant Dawson replied, "We'll work together on this." *Id.*  Defendant Ruth then said,

"Whatever needs to be done." *Id.*, p. 4.  Plaintiff said "all three of them" were nodding in

agreement. *Id.*

Plaintiff states in his affidavit that when Deputy Dawson ordered him to submit to

the breathalyzer test, he did his "best to breathe repeatedly into a small tube,

considering the extent of [his] injuries." *Id.*  Defendant Dawson "got angry and

repeatedly jabbed [Plaintiff's] nose with his forefinger causing [his] nose to start bleeding

again." *Id.*  Plaintiff avers that Defendant Dawson told him that he would keep taking

the test "until it comes out positive." *Id.*  Plaintiff took the test four times. *Id.*

Plaintiff states that Defendant Ruth told the nurse not to document Plaintiff's injuries. *Id.*

The nurse complied with that direction, over Plaintiff's objections. *Id.*  Plaintiff begged

the nurse to see the doctor, and the nurse had Plaintiff sign an inmate Access to

Medical Care form, which would allow Plaintiff to be treated. *Id.*  Plaintiff reports a delay

of a week before receiving "medical attention," presumably meaning the attention of a

physician. *Id.*  Defendant Ruth also instructed other booking officers to cleanse

Plaintiff's face for "sanitized" booking photographs. *Id.*, p. 5.  Defendant Ruth said, "I

don't want that blood to show.  Make sure those injuries don't show." *Id.*  However,

Defendant Ruth took pictures of Plaintiff's elbow, and threatened Plaintiff in the process

saying, "If you don't lift your arm, I'll make you lift your arm and worse." *Id.*  Ruth said,

"We've got to make this look like a fist fight." *Id.*

Plaintiff was left in the isolation cell for hours and avers that he was "lying in pain

on the floor." *Id.*  He finally was taken by a wheelchair to H-pod and "dumped out of the

wheelchair and onto the concrete floor of cell #27." *Id.* Plaintiff states that for the next

six days, he was "in excrotiating [sic] pain on the steel 'bed' which [he] had crawled

onto." *Id.* Plaintiff says he was "unable to eat for three (3) days." *Id.* Over the next six

days, Plaintiff says he "was denied any medical care for [his] extensive injuries" and

was denied "any pain medication" or sheets, a pillow, toothbrush, toothpaste, soup, or

the means to bathe.[7] *Id.*, p. 6. Plaintiff reports that he "was denied a telephone call"

and paper, writing implements, or "any form of communication." *Id.*

Plaintiff further states in his affidavit that each time the nurse came to his cell

door to obtain his "urine and stool samples, [he] begged to see a doctor or for some

medical attention for [his] extensive injuries." *Id.*, at 4. Plaintiff reports that the nurse

told him he could not be examined by a doctor until he "was transferred out of H-pod,

according to 'jail policy.' " *Id.*

On January 4, 2006,[8] Plaintiff was moved to L-pod and was given a pencil and

forms and he wrote grievances about his treatment during the prior week. *Id.*, at 5.

Plaintiff was examined by the doctor on January 5, 2006, and Plaintiff said the doctor

documented his injuries, ordered more tests, and provided Plaintiff with medications. *Id.*

Plaintiff said he remained "in a wheelchair" for two years due to his spinal injury, and

his "broken teeth would not get a dentist's help until 2010." *Id.* Plaintiff states that he

was sent to Florida State Hospital on January 8, 2007. *Id.*

---

[7] When Officer Holly Lofland saw Plaintiff back at the jail after arresting him,
Plaintiff "had already been down to the shower and back already." Ex. I (doc. 103-3, p.
25). She remembered "seeing him laying on his back in [a holding cell] in blues." *Id.*

[8] Plaintiff's first grievances are dated January 4, 2006. Ex. E, pp. 5-6. Those
grievances do not allege denial of hygiene items.

As additional evidence, Plaintiff submitted the narrative report and probable

cause affidavit submitted by Defendant Dawson.  Ex. C (doc. 103-1, p. 17).  That

document is relevant for Defendant Dawson's explanation of what happened during

Plaintiff's breathalyzer test:

> I started the test basing that on his statement that he wanted to take the test.
> After I hit the start test button, and inserted the card, he began to question me
> again about what was going to happen if he did not take it.  When I told him his
> license would be suspended, he acted concerned, and put the mouthpiece in his
> mouth, and was very lucid.  He would at first suck in.  I could see his cheeks go
> in, instead of puffing out as they would if he was blowing.  The mouthpiece also
> went into his mouth further when he began sucking.  I told him it was obvious he
> was sucking in, not blowing, and he apologized.  I told him if he did that again, it
> would be taken as a refusal.  He then loosened the seal around the mouthpiece
> and let the air escape around his lips.  He blew momentarily, and then he
> grabbed the mouthpiece and jerked it out of his mouth after being told not to
> touch the instrument.  He became belligerent, and the first attempt expired with
> no sample taken.  The second time, I saw the mouthpiece go in his mouth further
> as he sucked in, and out of his mouth as he blew out, and in again as he suck
> again, and out when he blew out.  His cheeks also sucked in a he suck in, and
> then puffed out as he let the mouthpiece slip out of his mouth.  This happened in
> this pattern several more times.  I told him that I was going to take it as a refusal.

*Id.*

Plaintiff also submitted copies of "incident scene photos."  Ex. D, Doc. 103-2, pp.

2-5.  These photographs appear to have been taken while Plaintiff was handcuffed in

the back of the patrol car on the night he was arrested.  *Id.*  The paper copies are in

color and are better evidence of the injuries that Plaintiff incurred.[9]  Plaintiff had a

bloody nose, a bleeding cut or abrasion at the top of Plaintiff's forehead, and possibly

another gash to the left side of Plaintiff's nose, stretching across his cheek, though that

---

[9] The photographs as scanned on CM/ECF are in black and white.  Doc. 103-2.
Tallahassee Police Officer Bascom took the photographs on scene.  Ex. I (Doc. 103-3,
p. 33). The existence of these photographs separate and apart from a booking
photograph suggests they were taken solely to document Plaintiff's physical condition
and injuries.

could be blood which ran across Plaintiff's check from his bloody nose.  *Id.*  There also appears to be a small scrape on Plaintiff's right elbow.  *Id.*

Plaintiff also presented copies of photos taken by Lieutenant Davis at the jail on January 6, 2006, and his booking photographs.  Ex. E (doc. 103-2, pp. 15-18).  In the third photograph, the blood is cleared from Plaintiff's face and there is no cut or gash on Plaintiff's left check (as suggested by the arrest scene photographs), but the gash on his forehead is visible and the first three photographs.  *Id.*  The fourth photo shows Plaintiff with his arm raised, presumably to show the scrape near his elbow.  The date stamp for the four booking photos is December 30, 2005, at 2327 hours.  Doc. 103-2, p. 10.

Plaintiff has presented medical records from the Jail as Exhibit F (doc. 103-2, pp. 19-25), which he contends are false, but he also presented other medical records as Exhibit G (doc. 103-3, pp. 1-33), which he identifies as "accurate."  The blood pressure check sheet indicates Plaintiff was seen by a nurse at 0445 hours on December 31, 2005, twice on January 1, 2006, at 0930 hours and 2150 hours, twice on January 2, 2006, at 0930 hours and 2302 hours, and once more on January 3, 2006, at 0915 hours.  Ex. G (doc. 103-3, p. 3).  That exhibit reflects that Plaintiff had a medical test conducted on or about January 2, 2006, which is listed as a "UTI."[10]  *Id.*, p. 4.  The same test for urinary tract infection was done again on January 5, 2006.  *Id.*, p. 5.

Plaintiff was seen in sick call on January 5, 2006, for multiple complaints.  *Id.*, p. 6.  Several "UA's" (urinalysis) were to be taken that day, and again on January 7th and

---

[10] UTI is a medical abbreviation for urinary tract infection.  MEDILEXICON, found at: http://www.medilexicon.com/medicaldictionary.

9th to monitor for presence of blood in his urine, an EKG[11] would be taken for his

complaint of periodic chest pain, although he did not have pain at that time.  *Id.*  He was

given Ibuprofen for his pain, an X-ray was ordered, and his bruises were noted.  *Id.*

Plaintiff reported having blood in his stool, and said he would monitor that and advise if

that problem recurred, but he reported "none now present."  *Id.*

The X-ray was taken and revealed "moderate thoracolumbar scoliosis" and "mild

degenerative arthritis."  Ex. G (doc. 103-3, p. 8).  No fractures were seen, and there was

only mild joint space narrowing at L4-L5-S1, spina bifida at L5-S1, and mild hypertrophic

spurring.  *Id.*  Plaintiff was given a work clearance on January 9, 2006, and the form

contains a check-mark for "not clear – due to medical reasons" and under limitations is

the comment, "wheelchair bound."  *Id.*, p. 9.  The medical records reveal physicians

orders were entered for Plaintiff on December 31, 2005; January 1, 2006; January 5,

2006; January 11, 2006; January 26, 2006; February 4, 2006; February 9, 2006; and

February 17, 2006.  Ex. G (doc. 103-3, pp. 11-12).  Beginning on January 5, 2006,

Plaintiff was given Ibuprofen and Flexeril.  *Id.*

Plaintiff filed a copy of his deposition testimony as supporting evidence.  Doc.

103, Ex. J (doc. 103-4, pp. 1-72).  Plaintiff testified that the EMS put a portable

electrocardiograph machine on Plaintiff and told the police that Plaintiff was having a

heart attack.  *Id.*, p. 18.  The unidentified EMS official said, "We should take him to the

hospital" but the police officer said, "No, we're taking him to jail."  *Id.*

Plaintiff testified that he has "a vivid memory" and remembers what happened,

but said he "can't remember every little detail, but I remember being taken in and they

---

[11] The EKG was taken on January 5, 2006.  Ex. G (doc. 103-3, p. 7).

threw me to the floor of an isolation cell." *Id.*, p. 19.  Plaintiff was asked who the "they"

were who threw him to the floor, but he never identified anyone who did this.  *Id.*

Plaintiff contends "TPD took over the booking room" and they were telling "what needed

to be done to the deputies on duty."  *Id.*  Plaintiff contends the whole booking process

"was not really finally finished . . . until like eight hours later."  *Id.*, pp. 19-20.  Plaintiff

said that when he entered the jail, the "TPD officer went into the main booking area"

and "deputies at the jail held [him] against the wall."  *Id.*, p. 20.  Plaintiff did not know the

name of any of those deputies.  *Id.*

Plaintiff said "there were deputies standing around" him, and after he was on the

wall, "they flopped me on the floor . . . and that's when they stripped my clothes off of

me."  *Id.,* pp. 24-25.  Plaintiff said the deputies told Plaintiff to take off his clothes, but he

reports that he"was so beaten badly and [he] could barely breathe, [he] couldn't get [his]

clothes off."  *Id.*, p. 25.  So the deputes removed his clothes and gave him clothes to

wear, and "they actually had to help put them on."  *Id.*  Plaintiff said at first that he was

only given "a pair of blue pants or something to put on" and no shirt, but then said

"[t]hey may have given me a shirt, too."  *Id.*

Plaintiff said he "had excreted in all [his] clothes" and Dawson "ripped off" his

clothes.  *Id.,* p. 24.  Plaintiff testified that Defendant Dawson "took my underwear, which

had rather a large volume of excrement in it, and he rolled it up into a little ball, because

he had plastic gloves on, and he stuck it in my hand, and he said, 'You need to put

these back on,' and they all laughed."  *Id.*  Plaintiff added that because he "was so in a

state of shock, and had been bleeding, and [his] back had been injured" and he "had

been beaten so badly, [he] was almost semiconscious," that Defendant Dawson "pulled

[Plaintiff's] hand up and stuck them in [his] hand."  *Id.,* p. 26.  Plaintiff said, "I can't" and "Bring me some fresh underwear."  *Id.*  An unidentified deputy brought Plaintiff fresh underwear and the deputies in the room helped him put them on.  *Id.*

Plaintiff contends that some of the deputies "made rather derogatory statements" to him because of his appearance.  *Id.*, p. 21.  Plaintiff says "they" accused him of being homeless, a vagrant, beating up a cop, and having stolen the car.  *Id.*  After five or ten minutes, Plaintiff was taken "to an isolation cell" by two deputies (Plaintiff does not remember their names) and they threw him on the floor.  *Id.*  Plaintiff testified in his deposition that he "was in that isolation cell for about eight hours," but he also acknowledged that "they brought me out periodically."  *Id.*

Plaintiff claims that while in the isolation cell he saw Defendants Dawson and Ruth speaking with arresting TPD officer Lofland and heard her say, "I beat him up badly."  *Id.*, p.23.  Plaintiff claims Defendant Dawson said, "We'll work together on this," and Defendant Ruth added, "Whatever needs to be done."  *Id.*  Then Officer Lofland came up to Plaintiff's cell and taunted him by saying "You're a homeless guy, aren't you?  You're a tramp, a vagrant.  You stole that car, didn't you?  It just hasn't been reported."  *Id.*, pp. 23-24.

Plaintiff testified that the first time he was taken out of the isolation cell was after an hour, when Defendant Dawson told Plaintiff he needed to take a breathalyzer test.  *Id.*, p. 29.  Two deputies took Plaintiff out of the isolation cell and to a "little room" for the test.  *Id.*  Plaintiff said that Defendant Dawson "misadministered it deliberately."  *Id.*, p. 30.  Plaintiff said that Defendant Dawson told Plaintiff "you need to take this test" or "you have to take this test" and Plaintiff denies that Dawson advised him what would

happen if he did not take the test.  *Id.*  Plaintiff said Defendant Dawson explained to him

that he had "to breathe in this tube" and Plaintiff claims "I did what I was told."  *Id.*

However, Plaintiff said that he "had shortness of breath from being kicked and beaten,

and I was bleeding still, and I was bruised and swollen, and I tried to breathe into the

little tube."  *Id.*  Plaintiff said that Defendant Dawson got angry with him and said,

"That's not good enough."  *Id.*  When asked whether Defendant Dawson told Plaintiff he

was "doing the test wrong or anything like that," Plaintiff said, "I recall him saying,

'That's not good enough.' "  *Id.*  Plaintiff said, "I'll try again" and he said he tried four

times, but Defendant Dawson "got angry, and he came over and put his finger in my

face and said, 'You're gonna take this, you're gonna take this test until it registers

positive,' and he poked me in the nose like that and it started bleeding again."  *Id.*, p. 31.

Plaintiff said, "As far as I'm concerned, I blew as best as I could, considering the extent

of my injuries."  *Id.*  After that, two unidentified deputies took Plaintiff "back to the

holding cell and dumped [him] there."  *Id.,* p. 31.

Plaintiff said he was lying on the floor of the isolation cell "for a long period of

time."  *Id.*, p. 34.  There are no clocks in the room, but Plaintiff thinks he was there for

"hours."  *Id.*  Then two deputies came to the cell and said they were taking Plaintiff to

the nurse.  *Id.*  Plaintiff said they grabbed him by the arms, pulled him up, and dragged

him along and then dropped him "in a chair in front of the nurse."  *Id.*  Plaintiff later

determined the nurse was Edith Brandt.  *Id.*

Plaintiff said the nurse had him sign a form for medical attention and also filled

out a health assessment form.  *Id.*, p. 35.  Plaintiff contends the nurse "did not put the

right answers on" the form, but Plaintiff acknowledges that the nurse asked Plaintiff if he

had any injuries, and he said his "face was a bloody mess" and his "teeth were broken." *Id.* Plaintiff said that she filled out the paperwork as he was telling her his injuries, but contends "she filled some out without even looking at me." *Id.* Plaintiff said that Defendants Ruth and Dawson were present and talking to the nurse. *Id.* Plaintiff said Defendant Ruth told the nurse, "Do not document his injuries." *Id.*, p. 36. Plaintiff said she did not say anything back to him, "she went down just on this first page here, receiving screening physical, she just marked what she wanted." *Id.* Plaintiff contends he said to her, "You can't do that" and she replied, "You don't tell me how to do my job." *Id.* Defendant Ruth just "glared at" Plaintiff. *Id.*

When questioned as to what was false on the medical records, Plaintiff said she wrote "scratches and abrasions on face and right arm by the elbow" but he claims that was a "minimalization and a misrepresentation." *Id.*, p. 37. Plaintiff also said that she should have written "injuries occurred during arrest," and not just "injury," which Plaintiff claims minimizes his injuries. *Id.* He said, "This is such a gross misrepresentation of the degree and extent of injury that it constitutes concealment." *Id.*

Plaintiff testified in his deposition that when he walked into the jail, he had "bleeding gashes from" his face, and "his nose was bleeding from being punched." *Id.*, p. 27. Plaintiff said he had bruises on his back, shoulder, throat, and arm where he had been kicked, and had cuts on his kneecaps. *Id.* He said his "arms and [his] whole body was swollen" and he had broken teeth. *Id.*

On the "assessment record" form, Plaintiff contends it is deliberately false because the nurse wrote: "Injury: No.  Bleeding: No." *Id.*, p. 40. Plaintiff said that is false, and he also pointed out that she wrote, "Head Injury: No" and "Bruising: No" and

"Any symptoms requiring immediate attention: No."  *Id.*  Plaintiff said that she wrote

"minor injuries" but he says he had "major injuries."  *Id.*  Plaintiff again argues that is "an

attempt to minimalize and conceal the extent and severity of damage done to [his]

body."  *Id.*, pp. 40-41.  Plaintiff testified that the nurse did not ask him the questions on

the form, she "went down and just circled stuff."  *Id.*, p. 41.  Plaintiff said he could not

even walk, deputies had to "drag" him, but she just "followed the instructions of"

Defendants Dawson and Ruth "to conceal the injuries as much as possible."  *Id.*, p. 42.

He said that "they broke my teeth," that his teeth had been fixed that year, and "they

kicked me in the teeth and broke my cap.  I had a cap, they broke it, and broke this

tooth off and broke these two teeth down here."  *Id.*, pp. 44-45.  He asserted that this

injury was not recorded.  *Id.*

However, Plaintiff admits that questions were correctly answered on the Mental

Health Evaluation form.  *Id.*  The nurse accurately indicated Plaintiff had been

hospitalized for mental health reasons, has Post-Traumatic Stress Syndrome and

PTSD, had prior counseling, and had attempted suicide "a long time ago."  *Id.*, p. 42.

Plaintiff said that while he was in the isolation cell at the jail, he "would yell,

'please, please get me to a doctor, please, please help me.' "  *Id.*, p. 45.  He said he

specifically asked Defendant Dawson and Officer Lofland and the nurse and "everyone,

everyone" for medical attention.  *Id.*  Plaintiff said he asked "[e]very staff member that

walked by that worked in that jail," to get him "to a doctor."  *Id.*  Defendant Dawson

ignored Plaintiff and said, "Stop whining, stop your whining, I don't want to hear it."  *Id.*

Defendant Ruth just ignored Plaintiff and the nurse told Plaintiff, "you'll get medical

treatment in the future."  *Id.*, p. 46.

Plaintiff said that Defendants Ruth and Dawson and Officer Lofland "conspired together to conceal [Plaintiff's] injuries, because [Lofland] knew she had beat me up very badly and that she did not want anyone to know." *Id.,* p. 47.  Plaintiff said they falsified other documents such as "arrest related documents." *Id.*  Plaintiff said that Defendant Dawson made false statements within those documents when he said that at the scene of the arrest, Plaintiff "was screaming and acting irate." *Id.*, p. 48.  Plaintiff claims that is "a lie" and claims he was "semiconscious from being" hit and kicked by Lofland.[12]  *Id.*  Plaintiff contends that the report is false when it says Plaintiff's "eyes were bloodshot and glassy" and that he "was resistant with EMS" and that Plaintiff "continued screaming at them" and "was belligerent." *Id.*, p. 49.

Plaintiff said Defendant Ruth misrepresented how Plaintiff took the breathalyzer test and the results of the test.  *Id.*, p. 51.  Plaintiff claims he also directed the nurse to falsify medical documents and "directed them to falsify the photographs." *Id.*  Plaintiff claims that Defendant Ruth "did not want to take appropriate photographs." *Id.*  Plaintiff said that Ruth "took photographs of my face for booking after they had cleansed my face to make it look like the injuries did not occur." *Id.*  Plaintiff also claims that

---

[12] While Plaintiff asserts that he was not unmanageable but was incapacitated and only "semi-conscious," the evidence reveals no other physical altercation between Plaintiff and law enforcement except at the scene of the traffic stop which led to his arrest.  I reviewed the video of that incident when ruling on Plaintiff's claims in case number 4:09cv142.  Plaintiff was not semi-unconscious but he seemed to be very drunk.  He resisted arrest by Officer Lofland and tried to drive away.  Lofland struggle for sometime with Defendant, trying to get the key and ordering him to stop resisting.  When backup officers arrived, she punched Defendant several times.  Defendant then was quickly pulled from the vehicle, taken to the ground, and handcuffed.  The officers did not kick or hit him.  The abrasions and cuts on his face probably occurred when he was taken to the ground.

Defendant Ruth took a photograph of his elbow that had "a scrape on it, not a scratch."[13]  *Id.*

Plaintiff said that the only time he was touched by any people at the jail was when Defendant Dawson "was poking [him] in the nose and the humiliation."  *Id.,* p. 53. No punching or kicking was done, but Plaintiff said Defendant Ruth verbally threatened Plaintiff that if he "didn't lift [his] head up so he could take a photograph" Defendant Ruth said he would "make [him] do it and worse" and Plaintiff "felt that was a threat."  *Id.* Plaintiff also felt Dawson was threatening to him when he was taking the breathalyzer test.  *Id.*  Beyond that, Plaintiff could not recall him being threatened, but added that "I've lost part of my memory on some of this, I'm sure."  *Id.*, p. 54.

Plaintiff said that when he was finally moved to H-Pod at the jail, he "was left there for a week before" he saw a doctor.  *Id.*, p. 54.  Plaintiff said they knew he needed a wheelchair, but he had nothing.  *Id.*  Plaintiff listed his serious medical needs upon his arrival at the jail as a "dislocated lower back, compressed and dislocated vertebra, the gashes in [his] face, the bruising to [his] body" and "abdominal bleeding, internal bleeding . . . ."  *Id.*, pp. 55-56.  Plaintiff contends he had internal bleeding because he had blood in his urine and stool.  *Id.*, p. 56.  Plaintiff felt he "should have been in a medical ward and not in H-Pod isolation."  *Id.*

Plaintiff said that when the nurse was asking him if he had problems with his stomach, he said, "Oh, I don't know, well, maybe."  *Id.*, p. 60.  Similarly, when asked in

---

[13] At another point Plaintiff said Ruth did not actually take the photographs, but "supervised it."  *Id.*, p. 52.  "There was some guy that's a police deputy photographer." *Id.*  Plaintiff testified in the deposition that Defendant Ruth said, "I don't want that blood to show.  Make sure those injuries don't show."  *Id.*

the deposition whether he had problems with his heart prior to the incident, he replied,
"No. I don't believe I did.  I may have, but I don't think so, not to my knowledge, not that
I can recollect."  *Id.*  When asked whether he had high blood pressure prior to the
incident, Plaintiff replied, "Not - I don't - not to my knowledge, but, I mean  . . . I'm not
sure.  See, I can't recall exactly."  *Id.*, p. 61.

**Analysis**

### Individual Capacity Claims against Bennett and Campbell

Defendant Bennett was the jail administrator, but the undisputed evidence shows
that he had no personal involvement with Plaintiff.  The evidence similarly shows that
Defendant Campbell, as the Sheriff, had no personal involvement either.  Plaintiff now
has submitted a statement that he "herein withdraws his claims against Defendants
Campbell and Bennett in their 'individual capacities.' "  Doc. 104, p. 10.

Plaintiff, however, may not simply voluntarily dismiss these claims without a court
order as Defendants had already filed a summary judgment motion.  FED. R. CIV. P.
41(a).  There has not been a stipulation to dismiss the claims and Plaintiff has waited
until the final hour to submit his notice, a notice that has not been filed as a separate
Rule 41 dismissal, but simply within his response in opposition to summary judgment.
Defendants are prejudiced by Plaintiff's actions and now are entitled to judgment in their
favor.  Indeed, the individual claims against them are frivolous.

### Official capacity claim against Defendant Bennett

Plaintiff claimed that Defendant Bennett was deliberately indifferent in his official
capacity to Plaintiff's serious medical needs.  Because this Defendant does not have
final policy making authority, an official capacity claim is not appropriate.  Scala v. City

of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997).  While Defendant Campbell

delegated authority to Defendant Bennett "to oversee the day-to-day operation of the"

Jail, all policymaking authority rests solely with Defendant Campbell.  Moreover,

discretionary decisions made by Defendant Bennett are also "subject to review by

Defendant Campbell as the Sheriff.  In that situation, § 1983 liability is precluded against

the officer with delegated authority.

> [T]he mere delegation of authority to a subordinate to exercise discretion is not
> sufficient to give the subordinate policymaking authority. Rather, the delegation
> must be such that the subordinate's discretionary decisions are not constrained
> by official policies and are not subject to review.

Mandel v. Doe, 888 F.2d 783, 792 (11th Cir. 1989), quoted in Scala, 116 F.3d at 1399.

Defendant Bennett is entitled to summary judgment on all of Plaintiff's official capacity

claims.  Indeed, those claims against Bennett are frivolous.

### Official capacity claim against Defendant Campbell

A suit against a state official in his official capacity is treated as a suit against the

state or county itself.  Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d

301 (1991).  However, municipalities cannot be liable in a § 1983 action on a theory of

respondeat superior or because it employed a tortfeasor.  Monell v. Dep't of Soc.

Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (holding that

local governing bodies can be sued directly under § 1983 where a constitutional

deprivation is caused by official policy or custom).   "Municipal liability under 42 U.S.C. §

1983 may be premised upon a single illegal act by a municipal officer only when the

challenged act may fairly be said to represent official policy, such as when that

municipal officer possesses final policymaking authority over the relevant subject matter." Morro v. City of Birmingham, 117 F.3d 508, 510 (11th Cir.1997).

Defendant Campbell has final policymaking authority over jail policies. Construed liberally, Plaintiff's claim against Defendant Campbell is that jail policy permitted the violation of his rights for medical care and items of hygiene. Doc. 18, pp. 15, 17. Plaintiff asserts that he is seeking liability because Defendant Campbell produced, implemented and supervised a jail policy which was "inadequate and deficient" and "resulted in widespread abuse." Doc. 104, pp. 1, 2.

Plaintiff has presented no evidence of "w idespread abuse." Plaintiff alleges that there was an unspecified "jail policy" (told to him by a nurse) that Plaintiff could not "see a doctor until after the Plaintiff was transferred out of H-pod." Doc. 104, p. 6. Plaintiff's affidavit stated that he was denied "medical care of [his] extensive injuries," and denied "sheets, a pillow, a toothbrush, toothpaste, soap, or the means to bathe." Id. Plaintiff also said he was denied paper, writing implements and a telephone call, and that he was told "that the denials were 'jail policy.' " Id. There is an identifiable jail policy, but it is contrary to the allegation. Procedure 9.01 directs that inmates are to be provided these items of hygiene.[14] Accepting Plaintiff's evidence as true, however, the limitations of hygiene items for a brief period of five days (December 31st to January 4th), have not been shown to be the result of an identifiable jail policy. "[A] single illegal act by a municipal officer" is not a basis for liability unless the act "may fairly be said to represent official policy," Plaintiff has presented no evidence that the conduct was policy or

---

[14] Defendants' evidence was that Plaintiff was provided the items pursuant to Procedure 9.01, but Plaintiff refused to sign the form. That dispute of fact need not preclude summary judgment.

custom.  Plaintiff has not shown that Defendant Campbell was on notice that pretrial detainees were routinely, as a matter of policy, being denied hygiene items, sheets or pillows, and the like.  Because there is no evidence to support this claim, summary judgment should be granted in favor of Defendant Campbell in his official capacity.  The claim concerning a policy to deny hygiene items is frivolous.

This leaves for consideration the official capacity claim against Campbell for denial of medical care.  "To prevail on a claim of deliberate indifference to serious medical need in violation of the Fourteenth Amendment,[15] a plaintiff must show: '(1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury.' "  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009), *quoted in* Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010).  "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' "  Mann, 588 F.3d at 1307 (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)).  "In general, serious medical needs are those 'requiring immediate medical attention' " or is a condition which "worsens due to a delay."  Youmans, at 564, *citing* Hill, 40 F.3d at 1190.

The medical records presented here do not reflect that Plaintiff's condition worsened due to delay.  Rather, the records reflect that within a few days of his arrest, he no longer had chest pain and he no longer had blood in his stool or urine.  Plaintiff

---

[15] The obligation to provide medical care to pretrial detainees such as Plaintiff is founded upon the Fourth Amendment rather than the Eighth Amendment, although the standard is the same.  Andujar v. Rodriguez, 486 F.3d 1199, 1202, n.3 (11th Cir. 2007).

did not have any broken bones and he was provided mild medication (Ibuprofen) for his complaints of pain.[16]  Plaintiff complains that he did not see a doctor for six days, but the undisputed evidence is that Plaintiff *was* evaluated by a nurse within a few hours of arriving at the jail as Nurse Brandt indicates on the screening form Plaintiff was evaluated at 0100 hours on December 31, 2005.[17]  There was no pressing need to see a doctor for minor scrapes, abrasions, and bruises, and there is no evidence that these were "serious medical needs."  Indeed, Plaintiff's cuts did not even require stitches. Nurse Brandt cleared Plaintiff for admission and found no significant or serious injuries that required "immediate medical attention" from a doctor.  Plaintiff was given medical assistance and his wounds were cleaned,[18] he was evaluated by a nurse, and his condition was monitored by medical staff.  Plaintiff's health screening during intake was done as directed in Procedure 9.01.

The "broken teeth" question will be separately addressed.  In response to the motion for summary judgment, Plaintiff has presented evidence that his teeth were "broken" during the arrest.  Doc. 94, Ex. A (doc. 94-1, p. 6).  More specifically, Plaintiff testified in his deposition that "they broke my teeth," that his teeth had been fixed that

---

[16]  Where mild pain relievers provide sufficient pain relief, the implication is that the pain was only mild.

[17] While Plaintiff *argued* that the medical records were falsified and he was not seen as early as 0100 hours, *see* doc. 104, p. 16, Plaintiff did not provide *evidence* to demonstrate that he was not given a medical screening within several hours of arriving at the jail.  Further, Plaintiff acknowledged within his deposition testimony that he did not have a clock accessible to know what time it was.

[18]  It is undisputed that Plaintiff's wounds were given relatively quick attention because he complains that he was cleaned up or "sanitized" before booking photographs were taken.  In other words, Plaintiff's complaint of the sanitized photographs mean that his wounds were "cleansed."

year, and "they kicked me in the teeth and broke my cap.  I had a cap, they broke it, and broke this tooth off and broke these two teeth down here."  Doc. 103, Ex. J (doc. 103-4, pp. 44-45).  He asserted that this injury was not recorded.  *Id.*  The screening form that was completed by Nurse Brandt notes under dental history that Plaintiff had bad teeth, broken caps, and his last dental appointment had been one month earlier.  Doc. 94, Ex. H (doc. 94-8).

Medical treatment for broken teeth is an entirely new allegation of deliberate indifference to a serious medical need.  Plaintiff filed five complaints, and he has had an abundant opportunity to place this claim before the court.  Docs. 1, 10, 13, 15, and 18. The active complaint is the fourth amended complaint, doc. 18, and it replaces all earlier complaints.  In that complaint, Plaintiff did not allege that he had a serious medical need, broken teeth, that needed treatment.  Doc. 18, pp. 7-13 on the electronic docket. He alleges that he had "intense pain in his back, arms, stomach, and throat."  *Id.*, p. 8. He alleges that his nose was bleeding, and that he had gashes on his face and forehead, obvious bruises and swollen areas covering his body, and could not walk due to intense pain from his back injury.  *Id.*  Broken teeth are not mentioned.  He alleges that for three days he was unable to eat "due to his swollen neck and bruised throat, from being kicked by TPD officers," *id*, p. 9, but he does not allege that he could not eat due to broken teeth.  Accordingly, denial of medical treatment for broken teeth is not a claim that is before this court.[19]

---

[19] A clear claim for denial of medical care for broken teeth did not appear in the earlier complaints, either.  The initial complaint does not even allege denial of medical care in violation of the Eighth Amendment, and there is no allegation of broken teeth. Doc. 1.  The first amended complaint alleges that the jail medical record shows that Plaintiff had "broken teeth," but there is no allegation of a failure to provide dental

In summary, Plaintiff has not come forward with evidence of an official policy which resulted in deliberate indifference to a serious medical need.  Moreover, there is no evidence in this record that Plaintiff *either* had a serious medical need *or* that his medical needs, such as they were, were ignored.  Not being examined by a doctor is not the equivalent of being ignored; Plaintiff was evaluated by the nursing staff.  Since Plaintiff was provided constitutionally adequate medical care, the question of causation, that is, an official policy, is moot.  Summary judgment should be granted in favor of Defendant Campbell on all official capacity claims against him.

### Individual and official capacity claims against Defendants Dawson and Ruth

Plaintiff has sued these Defendants in their individual capacities for denial of medical  care, "conspiracy," intentional falsification of official documents, and state law claims for assault, humiliation, and mental anguish.  He also alleged official capacity claims.

---

treatment.  Doc. 10, pp. 10, 21 on ECF.  The second amended complaint alleges that Plaintiff had had a heart attack, had bruising and internal bleeding, a spinal injury, and gashes on his head, but does not mention broken teeth.  Doc. 13, pp. 8 and 10 on ECF. That complaint, like the complaint before the court, alleges inability to eat due to a swollen neck and a bruised throat, but not broken teeth.  *Id.*, p. 11.  The complaint does, however, mention broken teeth as an injury presented to the physician on January 5, 2006, but there is no allegation thereafter that a specific treatment for broken teeth was needed and denied.  *Id.*, pp. 12-26.  The third amended complaint alleges back injury, bruises and swollen areas, and gashes on Plaintiff's face and forehead, but not broken teeth.  Doc. 15, p. 10.  This complaint likewise alleges inability to eat due to a swollen neck and a bruised throat, but not broken teeth.  *Id.*, p. 11.  Like the second amended complaint, this complaint alleges that broken teeth were among the injuries presented to the physician on January 5, 2006, but thereafter Plaintiff makes no allegation as to specific dental treatment that he should have received but was denied through a defendant's deliberate indifference.  *Id.*, pp. 12-21.  Broken teeth has never been adequately alleged as a claim in this case.

Plaintiff withdrew his official capacity claims against Defendants Ruth and Dawson in his opposition to summary judgment.  Doc. 103, p. 2.  For the same reasons Plaintiff's withdrawal should not be effective on the individual capacity claims against Defendants Bennett and Campbell, the official capacity claims should not be dismissed as to Defendants Ruth and Dawson.  However, summary judgment should be granted in their favor as to the official capacity claims as these Defendants are not policy makers.

Plaintiff's individual claims for the denial of medical care must fail for the reasons discussed above.  Plaintiff has not shown that he had a serious medical need.  Further, his condition improved and did not worsen, and Plaintiff was evaluated by a nurse.  Dawson was an arresting patrol officer who tried to administer the breathalyzer test, and would have had very little to do with providing medical care to Plaintiff at the jail.  Plaintiff has failed to show that Ruth was deliberately indifferent to a serious medical need.  Summary judgment should be granted in Defendants' favor as to the denial of medical care claim in their individual capacities.

Plaintiff's claim of a conspiracy to conceal his injuries is insufficient as a matter of law.  A claim for conspiracy under § 1985 must show: "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Trawinski v. United Techs., 313 F.3d 1295, 1299 (11th Cir. 2002), *cited in* White v. School Bd. of Hillsborough Co., 636 F.Supp.2d 1272, 1278 (M.D.Fla., 2007).  It must be shown, then, that "the conspirators were motivated by . . . racial, or otherwise

class-based, invidiously discriminatory intent." Kearson v. S. Bell Tel. & Tel. Co., 763 F.2d 405, 407 (11th Cir. 1985), *quoted in* White, 636 F.Supp.2d at 1278-79.  Plaintiff has come forward with no evidence that any actions taken were class based or racially motivated.

Furthermore, even *if* there were a conspiracy to conceal or not document Plaintiff's injuries, Plaintiff was not injured by that action.  Plaintiff received medical care and his wounds were "cleansed."  The fact that Plaintiff's face was cleaned before his booking photograph was taken is a frivolous claim.  A booking photograph is used to make positive identification of a person arrested.  It is *not* used to document injuries.  It was entirely proper to clean the blood off Plaintiff's face before taking the identity photographs.

Moreover, the evidence here reveals that a Tallahassee Police Officer made photos at the arrest scene of Plaintiff's injuries to *document* those injuries.  Plaintiff has not been harmed by that conduct.  Plaintiff's § 1985 conspiracy claims must also fail.  Accordingly, because § 1986 claims are derivative of § 1985 violations, those claims cannot succeed either.  Park v. City of Atlanta, 120 F.3d 1157, 1160 (11th Cir. 1997).  Summary judgment should be granted in favor of the Defendants on these claims.

**State law claims**

Plaintiff alleged that Defendants Ruth and Dawson took actions intended to "cause dread and extreme mental anguish" and committed an assault.  Doc. 18, p. 16.  Furthermore, Plaintiff seeks compensation for humiliation, mental anguish, and pain and suffering.  *Id.*, at 16-17.  Since there has been no violation of Plaintiff's federal constitutional rights, the Court should decline to exercise its supplemental jurisdiction

over the remaining state law claims.  Such a decision is entirely within the Court's

discretion as specified in 28 U.S.C. § 1367(c)(3).  Lucero v. Trosch, 121 F.3d 591 (11th

Cir. 1997); Palmer v. Hosp. Auth. of Randolph County, 22 F.3d 1559 (11th Cir. 1994).

As the parties dispute whether or not some of these state law claims are "independently

cognizable," these matters are best left to the state courts in Florida to decide.

**Conclusion**

In light of the foregoing, it is respectfully **RECOMMENDED** that the motions for

summary judgment, docs. 94 and 95, be **GRANTED in part** and summary judgment be

**GRANTED** in favor of Defendants on all federal constitutional claims, that the Court

decline to exercise its supplemental jurisdiction over the remaining state law claims, that

the Court **DIRECT** the Clerk to enter judgment in favor of those Defendants, and that

the Court *sua sponte* dismiss the complaint against Defendants Edith Brandt and J.

McFarland for insufficient service of process and failure to prosecute.

**IN CHAMBERS** at Tallahassee, Florida, on October 5, 2011.


 S/      William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and
recommendations within 14 days after being served with a copy of this report and
recommendation.  A party may respond to another party's objections within 14 days
after being served with a copy thereof.  Failure to file specific objections limits the
scope of review of proposed factual findings and recommendations.**